We'll now hear Pluma v. City of New York. After all that, I'm impressed that you're still here. Good morning or afternoon. My name is David Thompson of Steklow & Thompson for the Plaintiff Appellant Robert Pluma. The District Court's decision was based entirely on video which the District Court contended or found contradicted the allegations of the Plaintiff's complaint. This was a decision on Federal Rule 12c. Now the Supreme Court's decision in Scott v. Harris mandates that a court can dismiss on the basis of video only if the video so blatantly contradicts the Plaintiff's account that no jury could believe it. Here, the District Court took ambiguous video and interpreted it in the defendant's favor. The Court went further and found things in the video which the video does not show. Scott is clear that even with video, all inferences must be drawn in favor of the non-movement, which in this case is the Plaintiff. In addition, Graham v. With respect to his entitlement to survive dismissal, what in that video do you say is unclear? Well, as an example, the District Court found that the barricade in question was first touched and lifted up by the protesters rather than the police on the other side of the barricade. Does that matter? It mattered to the District Court. In the end, it got up in the air, no matter who first touched it. Isn't the video quite clear that at least after it was first touched, it was at least subsequently touched by both protesters and police? Well, actually, the video shows police pushing onto and down on the— And protesters pushing the other way. Well, it shows protesters behind the barricade. You can presume that they're at least using their bodies to resist getting flattened to the ground. And then it goes up in the air? After a period of time, yes. And then it comes down? Yes. Well, what's ambiguous about that? Well, the District Court imputed to the protesters the desire to pick up and lift and take away the barricade. Whereas the plaintiff's contention is, and it's consistent with the video, that the police picked up the barricade and used it as a battering ram. And raised it up and dropped it so that it would hurt somebody? Is that the theory? Well, what happened to the barricade after it was first used as a battering ram is not what injured the plaintiff. It did, in fact, end up getting sort of spun up and back. But the plaintiff was injured by a combination of the impetus into the crowd of the barricade pushed by police, and also the broadcast spraying of pepper spray, which blinded him and made him unable to— Well, that's after he went back away from the command to stop resisting and get away from the barricade. I mean, they're trying to maintain this barricade, which they're certainly entitled to do. There was no command to stop resisting and get away from the barricade. Well, what was anyone supposed to understand the police were doing with the barricade? Weren't they trying to get the protesters to move? No. If they were trying to use the barricade to push the protesters for the purpose of moving them— No, just to at least maintain it and say, get away from here. It's causing a riot. That's not what the video shows. The video shows this particular group of people. It looks like a riot. Well, there is disorder in parts of the park, but the question is— Not in parts of the park. Right on both sides of that barricade. It's pushing and shoving right around the barricade. If you review Video K, which is a close view from the police side of that barricade immediately before the incident, you see people standing with their hands at their sides. You've got a kid with a guitar. You've got— There are some seconds of—we've got several videos, and I'm sure there are some seconds of some videos where people are standing quietly, as you're suggesting. But there are certainly scenes where they're anything but standing quietly. Maybe different people. Maybe there's somebody who stood quietly. Other people are pushing and shoving, yelling. It's a near—if not a riot, a near riot. Well, there— In several scenes. Your Honor used the phrase other people, and therein lies the problem with the district court's decision below and with what the police did. If, you know, someone standing where Judge Hand is over there is doing something that merits the use of force, the police should use force on that person and not on yourself, where you are. Don't you have a more basic argument here? The district court was obliged to accept as true all of the well-pleaded factual allegations of the complaint, and it was entitled to consider any documents or, if the items were videos, videos that were incorporated by reference into the complaint. And the language is slightly broader in the cases, but you know what I'm referring to. Now, what happened that night, who knows, ultimately. There were scores, probably hundreds of people there, witnesses. There are videos from different angles. There may be other videos. I looked at these videos. I couldn't identify the plaintiff. I don't know where he was. Isn't the objection fundamentally that by going into the videos, other than the one or two that you acknowledged in your papers in the district court, were effectively incorporated by reference, was inappropriate? And given the sufficiency of the allegations of the complaint, it ought to go back. And it may be that the videos in question will prove to be very important evidence. Maybe they will ground summary judgment one way or the other. Maybe they will be very persuasive to a jury if it ever gets that far. But we're nowhere near that. That's correct, Your Honor, and that argument is made in our papers. Now, I looked at what you said in the district court because I think that's really pivotal. And you were a little less fulsome, perhaps, than I just was. And I can certainly see how the district court wound up where it is. The only reference I really found was at page two in your memorandum in the district court, which is document 72 in the district court docket. And you said that the complaint incorporated images only from exhibit F and G, and from a video not presented by the defendants, exhibit L. And then you said the defendants cannot claim, therefore, that the Second Amendment complaint incorporates any other videos. Then you said the plaintiff particularly objects to exhibit I and to the narration on exhibit F. Is that good enough here? Or did you effectively waive any objection to F and G except as to the narration on F? I'm not clear exactly what your position was and whether it was good enough. Well, I think the legal standard is itself controlling. And while it certainly would have been better for me to— Yeah, but if you—if the city put in a whole bunch of videos and you were objecting to the consideration, you had some obligation to say so. Otherwise, you're probably stuck with them. So I'm focusing on the scope and sufficiency of your objection in the district court. Well, the—certainly as to videos other than F, G, and L, they were objected to, I think, quite clearly. The objection to F and G is ambiguous. Is what? Ambiguous. What do you say was the objection to F and G? Well, the images were attached to the complaint for the purpose of identification. There were John Doe police officers and the— When you say the images, you're referring to stills in those two videos, not to the videos in gross. Right, there was no video annexed to the complaint. What's the objection to the videos labeled F and G? Well, they weren't annexed into the complaint. To the extent that they were referenced, it was— there were, I think, three stills from those videos that were annexed for the purpose of identification. Is there any available objection to them? Well, other than that they were not incorporated into the complaint, they are— And he wants to go back for trial. So at trial they offer F and G, and assuming they have the fellow who took it, is this a video, was this a fair and accurate representation of what you were seeing that night? He says yes. Do you have any objection? If at some point in time a witness says that, then it would be admissible. And is that what's missing here? This is almost like a self-executing document. It's a video. I mean, there's no claim this is a faked video, that this is a staged event in a back lot of a movie theater somewhere. This is a video of what happened that night, isn't it? They are all videos of what happened that night. Some of them may have been edited, we don't know, because, as I mentioned in the brief, the police videos sometimes are edited for reasons that are known only within one police plaza, and sometimes they're not. Edited meaning some things may be missing, but nothing's been added, has it? I'm not aware of any reason to think that video has been manipulated, no. But your position is that the police department staged a phony mob and got cops acting as cops and then created these phony videos. No, no, not at all. Your point is really different. Your point is, okay, we've got two or three videos from particular vantage points for particular parts of time. It's not everything. It's limited by the range of view of the camera for each video. There may be other videos. There, in addition, may be witnesses who have pertinent information that go to the merits of your claims apart from the videos, and that we shouldn't be deciding issues like this on a motion to dismiss on what may, in the fullness of time, turn out to be only a fragment of all of the relevant evidence. Correct. But why is that if the fragment shows a scene from which no reasonable jury could fail to find that an officer had a reasonable belief in the lawfulness of his action? The force that was actually used was inherently dangerous. It was inherently impossible to confine the force to wrongdoers as opposed to people who are admittedly, it's undisputed that the plaintiff in this case did nothing wrong. You had people who were doing something wrong and people who were not doing anything wrong, and they were all in the vicinity of a, I think it's called a French barrier that was floating around in the sky. They all could have been injured, and the police could have been injured too. Wouldn't you agree? No. So if we had a French barrier over your head, it wouldn't concern you, it might fall upon you. That wasn't the part that I was disagreeing with. Certainly you could be injured by a falling barrier. If you wanted to use, and if it was exigent, to get people out from under it and away so that the police can, as you say, push down upon it, which is of course where a barrier ought to be. It ought to be on the ground, so you ought to be pushing down upon it. And other people pushing up upon it. Why is it inappropriate to use some harsh measures in order to assure the safety of everybody concerned? The plaintiff's contention is that the barrier was on the ground, police officers picked it up and used it as a battering ram to hit the crowd. They didn't lift it up into the sky, did they? If that's what happened after the police started hitting people with it. Look, a battering ram is used against a locked door. That's what a battering ram is. These are people. These are people. They can move back. If the police are moving you back, they're not battering ram. If the police are moving you back, you move back. And if you don't, you're in trouble. If you're at the front of a crowd and there's a mob of people behind you and somebody comes at you with something immovable, the ability of the people to move back, those who are in the front, depends upon whether people further back, who perhaps can't see what's going on, move back and give them space. Isn't that right? That's correct. Look, let's just imagine hypothetically that what happens is this barrier comes down. There's a couple of cops at one end of the barrier. They see your injured plaintiff, and you come up with a witness somehow who says, two of the cops looked at your guy and said, that'll serve you bastards right. I hope it hurts. How about that? That would be indicative of a First Amendment retaliation claim. It would be indicative of the fact that the force was not applied for a reasonable purpose. No, I'll tell you frankly, I looked at the videos, and I don't disagree with views implicit in some of the questions of my colleagues, whatever their real views are. I mean, it was a mess. There's no question there was a mess going on there. But the point of my hypothetical is we don't know from the videos all of the pertinent facts. We don't know whether we know all of the pertinent facts, and I guess that's my concern. Well, your complaint, I take it, has no allegation of some outrageous anti-religious remark or anti-political remark that might shift this over into a First Amendment category, right? You're talking about excessive force in your claim. Excessive force in the way they handle the barricade. And if you look at video F, for example, at I believe 20 minutes and zero seconds, you'll see one of the named defendants, in this case Christopher Vega, pick up a barricade and attempt to hit a protester in the face with it because that protester has angered him with his words. And so, you know, you also can look at video K at three minutes and 13 seconds, and you'll see police officers taking the same barricade that ultimately caused the problem a few moments before and pushing that into the same group. So the police were, you know, they weren't issuing instructions, please stand back, they were doing this. And they were injuring people by doing that. I'm just indicating you ought to get out of the way, not verbally. I would argue that that's an inherently wrongful way to deliver an instruction. I understand your argument, that that's how you view what they were doing. And I also accept the argument at the moment that a person in the front row would have had difficulty, had he been using his head and calmly acting, getting to the back row. I think that's plausible. The question in my mind still remains, would an officer with his hands on that barricade and pushing it away, as you said, could a jury think he reasonably believed he was not denying anyone a constitutional right? Yes. Because that's what the district judge found here. Or said, not found, ruled. Correct. And so that's the question for us. Was that a correct legal ruling? Obviously the answer is no. There are disputed facts based on the video. The video doesn't show everything. The things that the video does show, it doesn't show all that clearly. If we don't know who did what to whom, and we don't, based on the video of how this barricade got moving to begin with, then we cannot usurp the role of the jury. So you're saying if the barrier got moved to begin with by police, who moved it forward from their position and backward to the position of the mob, then there was nothing that they could do, these individual defendant police could do, that would not be excessive force if they had to use pepper spray in order to return the thing to the ground. The point is they picked it up to push and injure the people standing in front of them. And that is, that's an allegation of the complaint, which is not. It wouldn't be the case if they moved back, would it? If they were able to move back, which is, again, a presumption which Scott says that inferences must be drawn in the favor of the non-movement, unless the video is so blatantly clear. Is it your position that they should have simply ordered people to move back? Well, that would have been a good first step. There were no orders to disperse. I had a case arising from the bridge issue in which it was argued that with the pandemonium and everything else going on, only people in the front could hear in order to move back, and if the people in the front are crowded from people in the back, they couldn't move back. So verbal orders don't cut it. Or in any event, the police, if they learned from that case, could have concluded that a verbal command is not going to be efficacious and that other measures might be required. That would be something for a jury to determine. I'm familiar with that case, and I believe that the basis for the ruling simply was that when they walked out onto the roadway of the Brooklyn Bridge, that the protesters should have known that absent instruction to the contrary, they were someplace they should not be. I also deposed Chief Esposito. It was also in that case a perfectly sensible observation that when pandemonium reigns, verbal commands may not be heard by everybody who has to clear the roadway, in that instance, or clear the way under a floating metal barricade up in the air. I deposed Chief Esposito in that case and asked him why he didn't put a line of officers to prevent people from going onto the roadway, and his answer was, because then I couldn't arrest them. So there were facts that— Well, the people crossing the bridge in a car might have wondered why there were no police officers. But in this case, the reason that the barricade got up in the air to begin with was because the police lifted it off the ground. And so the police activity was not for the purpose of returning a barricade to where it should rightfully be. The police activity was lifting the barricade from where it should rightfully be and using it for a purpose which the director of the Disorder Control Unit, and this is in the complaint, stated the barricade should never be used for. You reserve the rebuttal. I do. Thank you. Good morning, Your Honors. May it please the Court. My name is Melanie West for the Appalachian City of New York. The question in this case is not whether Mr. Pluma did something wrong. The question in this case is whether the police officer's use of force was objectively reasonable, taking into account their perspective at the time without the benefit of hindsight. And the video footage shows us that the answer to that question is yes. Because the video footage shows us that so clearly, Mr. Pluma wants to keep it out. But he can't. First, because he didn't object to the video footage below, except for Video I, which was excluded. But that's not exactly accurate, is it? Their brief at page 2 said the second amended complaint incorporated still images only from F and G, and from a video not presented by the defendants on this motion, attached as Video L. The defendants cannot, therefore, claim that the second amended complaint incorporates any of the videos. Now, it seems to me that they objected to everything, with the exception of the stills that were attached to the complaint, on pretty standard grounds. This is another case of which I see a great many, in which the Corporation Council makes motions to dismiss that really should be made as summary judgment motions, and then gets unhappy when the results go against them. And it's so much easier to do this in an appropriate way. Well, this is not a case where the plaintiff clearly objected to all the video footage. I just read it to you. I understand, Your Honor. But there's no question that he incorporated stills from some of the video footage that he had, and relied on that video footage in drafting his complaints. That's sufficient to bring it in for a motion to dismiss. Stills or videos? Well, he relied, he used stills from video footage that he had. He chose to use stills. What videos do you say are properly before us? At the very least, F, G, and L, which was preferred by Mr. Pluma. None of those were objected to below. I understand Your Honor's point that he says he only incorporated stills. And he elsewhere said that when deciding a motion to dismiss, courts may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, and documents possessed by or known to the plaintiff, and upon which it relied in bringing the suit. That is what we've said. That's right, Your Honor. How does he incorporate by reference? Because he, there's also a law that says that when you use partial documents, or when you put in partial documents, you bring in the whole. So, I mean, if it wasn't incorporated, then it was at least integral to the complaint. He had the video footage. He shouldn't be permitted to just cherry pick stills that suit him. You're talking for the San Leandro Medical Center case, which said that if you use a still, then you've consented to the court viewing the entire video. That's right, Your Honor. Or the case that said if you use statements from press releases or from newspaper articles, yes, then you bring in the whole. Is that rule a matter of getting something admitted into evidence at trial, or also considering it available as an annexation to a complaint for purposes of a motion to dismiss? The latter, Your Honor. The latter. Where it has been, where the document in question has been either incorporated by reference to or was integral to the complaint. So your proposition, so stills came from F&G, and therefore the complaint annexed the videos of F&G. That's your proposition? Yes. And I will note that an earlier version of the complaint had 100 stills from all the video footage. Sorry, could you repeat that? I didn't quite hear. An earlier version of the complaint had 100 stills annexed to it. Original? There was an in-between the first complaint and the second amended complaint, which is the operative complaint now. It's not in the appendix, but it's – Oh, okay. Because I don't think anyone has seen it. So it's only at this – even taking the second amended complaint only, there's no question that F&G, and it's undisputed that stills from F&G are included. But the history of this case does include plaintiff relying on all of the video footage, and that's how it came before the district court in the first place. What do you say to the idea that it would be unreasonable for police to lift and move forward with an immovable barricade into a dense crowd where the people in the front can't back up because there's people behind them? Again, Your Honor, I think it's the perspective of the police officers that's relevant. That's what I'm asking. The question is, what should they have done? The protesters, and you can see throughout the video footage, that the barricades became a focal point for the protesters. They were dismantling the barricades. They were moving the barricades. And the police officers – The dismantling of the barricades in either F or G? It is in F. I can give you the frames. It's at 1525 to 1555, and then again at 19 minutes to 20. How do you dismantle them? Do you pull them up, actually pull them up? That's right. I mean, they're separate metal pieces that are sort of connected together, and you can see that they're being piled. You can separate them apart? I think that's right. I'm not sure of the mechanics, but you can see that they're being separated and piled. Separated one section from the other, not taking apart a section. That's right. That's right, which I doubt anyone could do with their bare hands. They're held apart with pins that go through the two. You take the pins out, and you can take the barricades and then pile them up. Like uncoupling a railroad car. Is that it? Yes, exactly. That's what I could see. And so in the context of what was going on, if police officers were trying to maintain a perimeter for the protest with the use of barricades, it's difficult to know what else they could have done in that scenario. You do hear. His point is that's one way of viewing the video, but a jury could accept his plaintiff's claim that what, in fact, they were doing is using the barricade as a device to inflict harm on the crowd. They wanted to hurt them. And so they had this large metal apparatus, and they were pushing it against the crowd to hurt them. That's his claim. I would say that's simply not plausible in the context of the video footage, where you see these barricades being dismantled, piled in the park, being used by protesters, and then you see police officers pushing back. And the second thing is the subjective intent of the police officers is not the relevant question. It's whether what they were doing was objectively reasonable. So, I mean, to the extent that we're speculating that maybe they were angry, I mean, the question before the court is whether, in light of what was going on, their putting their hands on the barricade was objectively reasonable. I think the video footage shows us that the answer to that is yes. I also want to mention that when you read the complaint, the events as described in the complaint are so far afield from the video footage and what the video footage shows us, and that's relevant. That was obviously important to the district court. What the complaint describes is that Mr. Pluma entered the park, stood peacefully with others until he noticed the barricade. He noticed some activity and went towards it to see what was happening. And the video footage simply renders that version of events implausible. It does indeed blatantly contradict the complaint. What we see in the video footage is essentially a riot. There is an all-out brawl going on. And that context is... Wait a minute. What we see in the video is a relatively small area along, I don't know what street it is, but along the street. And you see more of what's going on in the police side of the barrier simply because the ones I looked at were taken from the crowd side. You don't see what's going on beyond the first couple of ranks of people within the park up against the barriers. For all I know, what's going on is more or less what the plaintiff says, that it was really quiet elsewhere in the park, that he saw activity. He walked over. I mean, it's not blatantly inconsistent. I mean, what you're inviting us to do and what this opens up is trying cases on the pleadings. And I think that's problematic. Furthermore, your argument about the stills picking up the whole of the video I think is based on cases that dealt with quite different circumstances. Most, not all, of the law in that area involves claims under the securities laws in which somebody says on May 14, 2009, General Motors stated in a press release A, B, and C, and that was false and misleading because it failed fully to set forth the true facts. And when you look at the full text of the very document that the plaintiff relies on, you actually see that two paragraphs later it states that which allegedly was omitted. Now, that's a very different case than a case like this where you're dealing with what happened in Zuccotti Park, a place a little bigger than an 8 1⁄2 by 11 sheet of paper that came out of some PR office, that involves hundreds and maybe thousands of people at different times, a whole lot of activity, only a tiny fragment of which is caught in a video or six videos, and I am concerned about extending a principle that makes perfect sense in the context of what an SEC filing or what a press release in fact said, not for the truth of what it said, only for the fact of what it said, to then saying if you attach a still of an event that came off a video, we're now going to consider the entire video, and we're going to consider it not just for what is on the video, but for the truth of the allegations of the complaint. It's a whole other ballgame. Maybe I misunderstood you. Did you tell us earlier this morning that there are cases where stills offered by the plaintiff have been deemed sufficient to let the defendant present a full video from which those stills were taken for purposes of incorporation in the complaint? I'm not aware of cases specifically dealing with stills. So there are only document cases of the sort, Judge Cotter? I think San Leandro emergency plan dealt with documents, written documents, but I think that the same principle applies, which is— You're arguing by analogy because if somebody puts in a still or a quote, they are saying that this is a document on which someone can rely. Absolutely, Your Honor. And there's not been any challenge to the authenticity of these videos, which is what Scott v. Harris is about. These are videos that were unquestionably in the plaintiff's possession that they looked at and relied on in drafting their complaint. That's the relevant standard for whether or not they are incorporated by reference or integral to the complaint. So I think that the same logic— I'll leave you with this further point. Even if I grant your assumption, I assume it's true, that they had them, they looked at them, and they drafted the complaint, they are dramatically different from the SEC filing or the press release that I spoke about in this respect. The SEC filing or whatever it is, whatever the piece of paper is, is in fact 100% of the evidence that exists in the world about what that document said. These videos are a tiny fragment of all the evidence that exists as to what took place in Ducati Park that night. But the question that the court has outlined in whether or not video footage can come in is that it should be authentic, it should not be doctored or altered, and that the plaintiff should have had it and relied on it in drafting his complaint. That's the universe of the requirements for bringing it in at a motion to dismiss stage, and all of those are met here. That's all the language of what a trial court asks at trial, authentic, fair, accurate portrayal. Those are not usually words that we use when we're testing a complaint. We do that at trial when the exhibit is offered. The question here is can this be presented to test a complaint? Well, it's not unprecedented that video footage is used. Well, that's what I'm trying to ask. For example, in Garcia V. Doe, the Brooklyn Bridge case. Oh, videos can be used, but I thought we were on the narrow, rather technical question, but perhaps pivotal, of whether a still is adequate to bring in a video for purposes considered annexed to a complaint. Right, Your Honor, and there is no specific case. No, there is not. There is only the analogy to cases where plaintiffs have not been permitted to cherry-pick from documents. In this case, supposedly these four stills were included for identification purposes. That's not usual. You don't need video or photographs to identify police officers. And it simply should not be the case that, you know, in Chambers, this court said that the rationale for not allowing documents outside of the pleadings to come in is that plaintiffs should not be unfairly surprised. They should have a chance to challenge the authenticity of a document. None of those concerns exist here. There's no question that they had the video, that they looked at it, and that they relied on it in drafting their complaint. And the video gives us an essentially undisputed view of what happened that night. Now, it may not be entirely true. Undisputed view of a fragment of what happened from a particular vantage point with a particular camera resolution, with a particular sensitivity to sound, very incomplete, clearly, and maybe the whole thing looks different. And maybe that goes to the way that the court views the video. Right, the weight. Yeah, but that's what trials are for. Then somebody says, yes, we've looked at the video, but we were standing in a different part, and from our vantage point, here's how it looked. Or maybe even somebody has their own camera, cell phone, and their view is different. It just worries me that you're confusing trial validity from complaint validity. But a judge is allowed to look at video to determine whether or not it contradicts the complaint. That is the bottom line you want us to hold, but the question here is, is that true? Do we adopt that? And that we'll have to watch. Thank you. We'll hear from everybody. I would just comment that Scott V. Harris, of course, was entertaining video on a motion for summary judgment where there had been discovery and the record was defined. If, in this case, the stills were deemed to incorporate F and G, then we would be in a situation where there are some six videos of which the court is only going to consider two, and there might be a seventh or an eighth or a ninth video out there somewhere that isn't in the record yet. And I think this is an excellent reason not to stretch this point beyond where it's been put in the area of documents. And as to the plausibility, I would like the court to look at A184, which is an image that's a still from Video K, if it's considered. And it shows a young man with his hands in the air with a stream of pepper spray going directly into his face. He had his hands up before. Is this your plaintiff? No. Is this your plaintiff? But the same spray going over that young man's shoulder hit the plaintiff. When you have a crowd, how are you going to spray one person and not somebody else? You don't. If you have to use spray in order to save people from a danger, then what if the police had said, We don't need to use spray. Let the damn thing fall on all those protesters. Who cares? You would have a very good case, wouldn't you? To repeat, it was the police that put the barricade in the air. Yes, and if the police had said, Let's not use pepper spray. Let it fall on them. They'll learn a lesson. They won't be doing this next time. You'd have a very good case, wouldn't you? It's a hypothetical. It's not part of this case. Correct. It's a hypothetical with one answer. Mason. Okay. Well, thank you both. Thank you, Your Honor. We're going to reserve decision.